IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARK VERNON CALLSHIM JR.,<br><br>Defendant. | Case No. 24-CR-00159-SEH |

## OPINION AND ORDER

Before the Court is the government's opposed motion to determine Indian Country as a matter of law. [ECF No. 88]. For the reasons provided below, the motion is granted.

A federal grand jury charged Defendant Mark Callshim Jr. with robbery in Indian Country, in violation of 18 U.S.C. §§ 1151, 1153, and 2111, and carrying, using, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). [ECF No. 51]. The government claims the alleged offenses occurred at the RaceTrak convenience store at 3100 E. Pine Street, Tulsa, Oklahoma. [ECF No. 88 at 2].

The government seeks a pretrial determination, as a matter of law, that 3100 E. Pine Street, Tulsa, Oklahoma is within the boundaries of the Cherokee Nation, and therefore within Indian Country, as defined by 18

U.S.C. § 1151(a). [*Id.* at 2–3]. The defendant objects to the government's motion. [*Id.* at 1].

"As a general matter, the trial court decides the jurisdictional status of a particular property or area and then leaves to the jury the factual determination of whether the alleged crime occurred at the site." *United States v. Roberts*, 185 F.3d 1125, 1139 (10th Cir. 1999). Therefore, a trial court "makes the jurisdictional ruling a particular tract of land or geographic area is Indian Country, and then instructs the jury to determine whether the alleged offense occurred there." *Id.*

Because the government is the party invoking the Court's jurisdiction, it bears the "burden of persuading this court by a preponderance of the evidence that the court has jurisdiction." *United States v. Bustillos*, 31 F.3d 931, 933 (10th Cir. 1994). "Indian Country" includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government." 18 U.S.C. § 1151.

The Cherokee Nation's reservation was created by federal law. The Indian Removal Act of 1830, Act of May 28, 1830, ch. 148, 4 Stat. 411, authorized the President to divide public domain lands into defined districts so that tribes like the Cherokee could be removed from their homelands and sent west of the Mississippi River. *Id.* at § 1. As part of this policy, the United States committed to "forever secure and guaranty" these new western lands to the

removed tribes, "and if they prefer it ... the United States will cause a patent ... to be made and executed to them for the same[.]" *Id.* at § 3.

The Cherokee Reservation in Indian Territory was established by treaties in 1833 and 1835. The 1833 Cherokee treaty "solemnly pledged" a "guarantee" of seven million acres to the Cherokees on new lands in the West "forever." Treaty with the Western Cherokee, Preamble, Feb. 14, 1833, 7 Stat. 414. The 1833 Cherokee treaty used precise geographic terms to describe the boundaries of those lands and provided that "a patent" would issue as soon as reasonably practical. *Id.* at Art. I. It confirmed the treaty obligation of the parties upon ratification. *Id.* at Art. 7.

Almost three years after the 1833 treaty, a new treaty was signed at New Echota. Treaty with the Cherokee, Dec. 29, 1835, 7 Stat. 478. Containing similar language to the wording found in the 1832 and 1833 Muscogee (Creek) treaties, the 1835 Cherokee treaty was ratified "with a view to reunite their people in one body and to secure to them a permanent home for themselves and their posterity." *Holden v. Joy*, 84 U.S. 211, 238 (1872). This land became known as Indian Territory, "without the territorial limits of the State sovereignties, and where they could establish and enjoy a government of their choice, and perpetuate such a state of society as might be consonant with their views, habits, and condition." *Id.*

Under the 1835 treaty, the Cherokee Nation "cede[d], relinquish[ed], and convey[ed]" all its aboriginal lands east of the Mississippi River to the United States. Art. 1, 7 Stat. 478. In return, the United States agreed to convey to the Cherokee Nation, by fee patent, seven million acres in Indian Territory within the same boundaries as described in the 1833 treaty, plus "a perpetual outlet west." *Id*. at Art. 2.

After removal, on December 31, 1838, President Van Buren executed a fee patent to the Cherokee Nation for the new reservation in Indian Territory. *Cherokee Nation v. Hitchcock*, 187 U.S. 294, 297 (1902). The patent recited the United States' treaty commitments to convey the land to the Nation. *Id*. at 307. The title was held by the Cherokee Nation "for the common use and equal benefit of all the members." *Id*. at 307; *see also Cherokee Nation v. Journeycake*, 155 U.S. 196, 207 (1894). A few years later, an 1846 treaty between the Cherokee Nation and the United States also required federal issuance of a deed to the Nation for lands it occupied, including the "purchased" 80,000-acre tract in Kansas (frequently described as the "Neutral lands") and the "outlet west." Treaty with the Cherokee, Aug. 6, 1846, Art. 1, 9 Stat. 871.

Like Muscogee (Creek) Nation, Cherokee Nation negotiated a treaty with the United States after the Civil War. Treaty with the Cherokee, July 19, 1866, art. 4, 14 Stat. 799. The 1866 treaty authorized settlement of other

4

tribes in a portion of the Nation's land west of its current western boundary, an area which became known as the Cherokee Outlet. Treaty with the Cherokee, *id.* at Art. 16. It also expressly ceded the Nation's patented lands in Kansas, consisting of a two and-one-half mile-wide tract known as the Cherokee Strip and the 800,000-acre Neutral Lands, to the United States. *Id.* at Art. 17.

The current boundaries of the Cherokee Nation are as established in Indian Territory in the 1833 and 1835 treaties, diminished only by the express cessions in the 1866 treaty described above, and by an 1891 agreement ratified by Congress in 1893. Act of Mar. 3, 1893, ch. 209, § 10, 27 Stat. 612, 640–43. The 1891 Agreement provided that the Cherokee Nation "shall cede and relinquish all its title, claim, and interest of every kind and character in and to that part of the Indian Territory" encompassing a strip of land bounded by Kansas on the North and Muscogee (Creek) Nation on the south, and located between the ninety-sixth degree west longitude and the one hundredth degree west longitude (i.e., the Cherokee Outlet). *See United v. Cherokee Nation*, 202 U.S. 101, 105–6 (1906). Cherokee Nation did not cede or restore any other portion of the Cherokee Reservation to the public domain in the 1891 agreement, and no other cession has occurred since that time. After the 1891 agreement, the Cherokee Nation Reservation took on the familiar shape it retains to the present day.

The government submits for the Court's review a link to a map of the Cherokee Nation showing that 3100 E. Pine Street, Tulsa, Oklahoma is located within the Cherokee Nation's Reservation boundaries. [*See* ECF No. 88 at 3 (directing the Court to https://cherokee.maps.arcgis.com/apps/webappviewer/index.html?id=921f8793c9914a7792274f72441fad8d)]. The Court finds that the government has carried its burden of showing by a preponderance of the evidence that the location of the charged events is within Indian country. A jury, however, must determine whether the alleged crimes occurred at this location.

IT IS THEREFORE ORDERED that the government's motion to determine Indian Country as a matter of law [ECF No. 88] is GRANTED.

DATED this 20th day of August, 2025.

                                                                 Sara E. Hill
                                                                 UNITED STATES DISTRICT JUDGE